## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ROBERT J. DENNIS,   :  Civ. A. No. 09-6171(NLH)(AMD)

   Plaintiff,   :

     v.    :  **OPINION**

COUNTY OF ATLANTIC COUNTY, :
CAPT. JOSEPH BONDISKEY, and
CAPT. STEVEN L. MURRAY,  :

   Defendants.  :


**Appearances:**

DANIEL M. KURKOWSKI
KURKOWSKI LAW, LLC
1252 ROUTE 109 S.
CAPE MAY, NJ 08204

 *On behalf of plaintiff*

DONNA M. TAYLOR
ATLANTIC COUNTY LAW DEPARTMENT
1333 ATLANTIC AVENUE
8TH FLOOR
ATLANTIC CITY, NJ 08401

 *On behalf of defendants*


**HILLMAN**, District Judge

 This matter has come before the Court on defendants' motion for summary judgment on plaintiff's employment discrimination claims. For the reasons expressed below, defendants' motion will be granted in part and denied in part.

## BACKGROUND

In February 2008, plaintiff, Robert J. Dennis, was hired by the Atlantic County Justice Facility ("ACJF") as a corrections officer on a probationary basis, pending the successful completion of training at the Atlantic County Police Training Academy.  Dennis was scheduled to attend the academy in October 2008, but his pre-academy physical in August revealed a very high triglyceride level.  Even though repeat blood work showed normal levels four days later, and his doctor believed the initial test to be erroneous, Dennis's spot at the academy had already been reassigned.  He was then scheduled to attend the January 2009 session.  The Division Director/Warden, Sean Thomas, warned Dennis that the January 2009 academy was his final opportunity to complete his required training, and failure to do so would result in his removal from his position as a county corrections officer.

In preparation for the January 2009 academy, Dennis passed his pre-academy physical.  The twelve week training began on January 29, 2009, and was comprised of a classroom component and physical training sessions.  Two weeks into training, on February 13, 2009, Dennis became lightheaded during a vigorous physical training session.  The chief instructor, Rick Bianchi, was concerned about Dennis's health and ability to complete the physical fitness portion of the training.  Warden Thomas was advised about the instructor's concerns, and Dennis was ordered

2

to be evaluated by the Atlantic County physician, Dr. Caddell, prior to resuming physical training.

On February 17, 2009, Dennis was seen by Dr. Caddell, who ordered a series of tests to determine if Dennis was suffering from coronary heart disease.  New Jersey state statute requires that all academy recruits successfully complete eighty percent of the physical training, and failure to do so mandates dismissal from the academy.  Because it appeared that in order to complete all the medical testing Dennis would exceed the allowable number of absences from the physical training classes, which were held three times a week, Dennis sought out advice from his instructors on what he should do.  They advised him to ask for a medical withdraw, which, if granted, would allow him to re-start the academy in another session if his medical tests came back normal.

On February 20, 2009, Dennis requested to be medically withdrawn from the academy.  That same day, after consulting with Warden Thomas and the Police Training Commission, defendant Captain Steven Murray, Compliance Unit Commander, denied Dennis's request.  Murray's letter did not state a reason for the denial.

Dennis underwent a series of tests, including an electrocardiogram, nuclear stress test, and halter monitor test. All the tests came back negative for any kind of heart condition. On March 6, 2009, the County doctor, Dr. Caddell, certified that Dennis did not have any physical limitations restricting him from

3

continuing the police academy training.  As of March 4, 2009, however, Dennis had exceeded his allowable absences.  On March 5, 2009, Dennis was dismissed from the police training academy for missing six (twenty percent) of the physical fitness training sessions.

On the same day he missed his sixth physical training session, Dennis slipped on ice and fell down the front steps at his home.  He sustained injuries to his shoulder, knee and back. He went to the emergency room and the hospital physician excused him from work for two days so that he could be examined by his primary care physician.  On March 5, 2009, Dennis's physician excused him from work until March 9, 2009 and provided him with a referral to an orthopedic specialist.  That same day, Dennis saw the orthopedic specialist, who excused him from work until March 23, 2009.

On March 5, 2009, Dennis asked the orthopedic specialist to complete paperwork so that he could request leave under the Family Medical Leave Act (FMLA).  Dennis turned in his FMLA request to the ACJF that day.  The officer who received Dennis's FMLA paperwork provided Dennis with a memorandum confirming his request for leave from March 4, 2009 through March 22, 2009. That same day, Dennis signed an acknowledgment that he was dismissed from the police training academy because of his sixth absence.

4

Despite having been dismissed from the training academy, and although he was required to complete the academy in order to maintain his position as a corrections officer with ACJF, as of March 5, 2009, Dennis was still employed by the ACJF.[1]

On March 9, 2009, Warden Thomas completed a "notice of disciplinary action," which suspended Dennis from his position at ACJF, effective March 10, 2009, because of his failure to complete the training academy in his allotted two attempts. Warden Thomas required that Dennis to be personally served with the notice.

Also on March 9, 2009, defendant Joseph Bondiskey, Operations Commander, received Dennis's FMLA paperwork that had been forwarded to him for his review.  Bondiskey found the dates on the paperwork to be conflicting.  He did not forward Dennis's FMLA request for further processing, however, because of his March 5, 2009 dismissal from the academy and his suspension from his position at ACJF that would be effective the next day, March 10th.

On March 10, 2009, Bondiskey and Murray arrived at Dennis's house unannounced.  According to Dennis, he had just awoken and was under the influence of pain medication.  His wife was present

---

[1]A person shall be given a probationary appointment as a corrections officer for a period of one year so that the person seeking permanent appointment may satisfactorily complete a basic training course for corrections officers conducted at a school approved by the Police Training Commission. N.J.S.A. 52:17B-68.1.

during the entire visit which lasted only a few minutes.
Bondiskey and Murray informed Dennis of his suspension.  The
parties disagree as to the content of the short meeting, but
Bondiskey and Murray state that Dennis did not wish to make a
statement and that he only requested a hearing, which had already
been scheduled for March 23, 2009.  Bondiskey and Murray claim
that their visit constituted the required Loudermill hearing,
which, under Cleveland Board of Educ. v. Loudermill, 470 U.S. 532
(1985), provides that a public employee is entitled to a limited
pre-termination hearing, as an initial check against mistaken
decisions, that assesses the reasonableness of the charges
against the employee.  Dennis claims, however, that he asked for
union representation, which was denied, and he was not permitted
to make a statement on his own behalf.  He also claims that he
asked about his FMLA rights, but was told that they did not
apply.

      Dennis's formal hearing before a hearing officer was
ultimately conducted on June 24, 2009.  Dennis was represented by
counsel, and assistant county counsel appeared on behalf of the
ACJF.  Testimony was taken from several witnesses, including
Warden Thomas, chief physical fitness instructor Bianchi, and
Bondiskey.  The hearing officer issued her opinion on July 21,
2009, and sustained the charges on Dennis's disciplinary notice.
Although the hearing officer did not explain whether the decision

to deny Dennis's request for a medical withdrawal was proper, she found the decision to dismiss Dennis from the academy was reasonable due to Dennis's failure to comply with the state-mandated attendance requirements.  She further found that because he had failed his second and final attempt to complete the academy, and completion of the academy was a requirement for Dennis's position as a corrections officer, his suspension pending termination was proper.  Thus, she ordered Dennis to be terminated effective immediately.

Subsequently, Dennis brought the instant suit against the County, Captain Bondiskey, and Captain Murray.[2]  Dennis claims that he was discriminated against in violation of his rights under the Americans with Disabilities Act and the New Jersey Law Against Discrimination because he was not provided with reasonable accommodations for his perceived disability (i.e., his heart condition).  Dennis further claims that defendants interfered with his rights under the FMLA for his request for FMLA leave due to his injuries from his fall on the ice.  Dennis also alleges that his due process rights under Loudermill and National Labor Relations Board v. J. Weingarten, Inc., 420 U.S. 251 (1975), were also violated.

---

[2]Claims against other defendants named in the original complaint have been dismissed by the parties' agreement.

Defendants have moved for summary judgment in their favor on all claims.  Defendants argue that Dennis's ADA claim fails because a public employer is not required to accommodate a "perceived" disability.  Defendants also argue that any discrimination claims under the ADA and NJLAD fail because they had no ability to accommodate Dennis since the dismissal from the academy was mandated by statute.  Defendants further contend that Dennis was provided with proper due process procedures under Loudermill and Weingarten.  Finally, the individual defendants argue that Dennis has not articulated any acts allegedly perpetrated by them relating to Dennis's alleged discrimination and due process violations.  Dennis has opposed defendants' motion.

**DISCUSSION**

**I.   Jurisdiction**

This Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

**II.  Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

8

Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ.
P. 56©).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit. Id. In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;
instead, the non-moving party's evidence "is to be believed and
all justifiable inferences are to be drawn in his favor." Marino
v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir.
2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating
the absence of a genuine issue of material fact. Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has
met this burden, the nonmoving party must identify, by affidavits
or otherwise, specific facts showing that there is a genuine
issue for trial. Id. Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party. Anderson, 477 U.S. at 256-57. A
party opposing summary judgment must do more than just rest upon

9

mere allegations, general denials, or vague statements.  Saldana
v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## III. Analysis

### A.   Dennis's ADA and NJLAD discrimination claims

Dennis claims that defendants violated his rights under the
ADA and NJLAD because he was not provided with a reasonable
accommodation for his perceived disability.  Specifically, Dennis
claims that his request for a medical withdrawal from the academy
so that he could complete the medical testing defendants required
of him was a reasonable accommodation for the disability--a heart
condition--the defendants thought he had.  Dennis claims that the
accommodation was reasonable because it had been provided to
other trainees in the past.  Their denial of that accommodation,
Dennis contends, was discriminatory and in violation of the ADA
and NJLAD.

In their motion, defendants argue that Dennis's ADA claim
fails because a public employer is not required to accommodate
someone who is only "regarded as" having a disability.
Defendants also argue that Dennis's requested medical withdrawal
was not a reasonable accommodation.  Moreover, defendants argue
that because Dennis's dismissal from the academy--and ultimate
termination from his position with ACJF--was mandated by New
Jersey state statute, it cannot constitute discrimination.

Both the ADA and NJLAD afford protections to a person who does not have a disability, but is "perceived as" or "regarded as" having a disability.  See 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."); N.J.S.A. 13:13-1.3 ("A person with a disability also means: 1. A person who is perceived as or believed to be a person with a disability, whether or not that individual is actually a person with a disability.").

In analyzing a claim for discrimination on the basis of a perceived disability, both the ADA and NJLAD use an identical process.  Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 70 (3d. Cir. 1996).  To prove either claim, a plaintiff must first establish a *prima facie* case of discriminatory discharge by showing: (1) he is disabled or perceived to have a disability; (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) he was fired; and (4) the employer sought someone else to perform the same work.  Bell v. KA Indus. Services, LLC, 567 F. Supp. 2d 701, 706 (D.N.J. 2008) (citing Muller v. Exxon

11

Research & Eng'g. Co., 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001)) (other citations omitted).

Dennis's *prima facie* case hinges on the first two elements. With regard to whether he is disabled or perceived to be disabled, Dennis ostensibly concedes that he does not have an actual disability, since all medical tests eventually cleared him of any heart condition.[3]  Thus, Dennis contends that defendants "perceived" that he had a heart condition.

Defendants do not directly negate Dennis's contention that they regarded him as having a heart condition, which, if he had one, would qualify him as disabled under the ADA and NJLAD. Instead, defendants point out that the 2008 amendments to the ADA exempt public employers from the requirement of providing accommodations for "regarded as" disabilities.

Defendants are correct.  The ADA provides that a public entity under subchapter II "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph ©) of such section," which concerns "being

_____

[3]Following his suspension and while waiting for his hearing, on March 11, 2009, Dennis applied for Worker's Compensation benefits.  In that application, Dennis described his workplace injury: "I felt dizzy and light headed during physical training. The heart was the part of the body affected."  (Def. Ex. L.)  It is unclear from the record whether Dennis was approved for Worker's Compensation benefits.

12

regarded as having such an impairment." See 42 U.S.C. §
12201(h).  Therefore, even if defendants thought that Dennis
suffered from a disability that he did not actually have, they
had no obligation under the ADA to accommodate him.

Defendants, however, do not address Dennis's "perceived as"
claim under the NJLAD.  Even though New Jersey "has frequently
resorted to federal law to interpret" the NJLAD, particularly in
employment discrimination matters, the NJLAD "is more expansive
and offers more protection in certain instances." Boyce v.
Lucent Technologies, 2007 WL 1774267 (N.J. Super. Ct. App. Div.
June 21, 2007) (citing Raspa v. Office of Sheriff of County of
Gloucester, 924 A.2d 435, 442-43 (N.J. 2007); Tynan v. Vicinage
13 of Super. Ct. of N.J., 798 A.2d 648, 656 (N.J. Super. Ct. App.
Div. 2002) (explaining that "disability" is more broadly defined
under the NJLAD than the ADA))(other citations omitted).  The
ADA's explicit exemption of a public employer's obligation to
accommodate "regarded as" disabilities cannot be automatically
written into the NJLAD.  See Victor v. State, 4 A.3d 126, 135
(N.J. 2010) (explaining that "a frequent observation that we rely
on the federal courts and their construction of federal laws for
guidance in those circumstances in which our LAD is unclear . . .
cannot substitute for understanding the ways in which the long
and rich history of our LAD and its interpreting regulations have

13

repeatedly intersected with those federal laws and their related regulations").

With to the first element of the *prima facie* case for discrimination based on a perceived disability, "even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Dean v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, app. § 1630.2(l) (describing, as one example of a "regarded as" disabled employee, an individual with controlled high blood pressure that is not substantially limiting, who nonetheless is reassigned to less strenuous work because of the employer's unsubstantiated fear that the employee will suffer a heart attack)). Here, Dennis has provided ample evidence in the record to support his contention that defendants perceived that he had a NJLAD-qualifying disability,[4] thus meeting the first element of his *prima facie* case. (See, e.g., Def. Ex. M, Dept. Hearing Decision, at 6, "there were concerns that [Dennis] had cardio related issues and that he was not physically up to the standard required."; Def. Ex. C; Pl. Ex. K.)  Consequently, the viability

_____

[4] See N.J.S.A. 10:5-5(q) ("'Disability' means physical disability, infirmity . . . which is caused by . . . illness  . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.").

of Dennis's NJLAD claim depends on whether he can establish the second element of his *prima facie* case: that he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation.

Dennis contends that he asked for the accommodation of being permitted to medically withdraw from the academy prior to exceeding his allowable absences so that he could complete the medical tests prescribed by the County physician, to whom the academy instructors and directors had sent him.  Dennis argues that this accommodation was reasonable because it would assuage any concerns about his physical capability to complete the academy--at least as it related to the instructors' concerns of the condition of his heart--and it was also an option provided in the past to other trainees who had medical conditions that would cause them to miss more than twenty percent of the physical training classes.  With this reasonable accommodation of withdrawing from the academy and being allowed to restart the program in the next session, Dennis contends that he would be capable of meeting all the requirements of his job as a corrections officer.[5]

---

[5]Although Dennis does not state the converse of his argument, it does not seem disputed that if the medical withdrawal was approved and Dennis's medical tests demonstrated that he had problems with his heart, it would not be as clear that he would be able to return to the academy and perform the essential functions of his job as a corrections officer.  If that were the case, Dennis could be considered to have an actual

A request for a reasonable accommodation in the workplace may be oral or written, but the employee does not have to explicitly request a "reasonable accommodation." <u>Boyce</u>, 2007 WL 1774267 at *5 (citation omitted).  When an employee clearly expresses a desire for assistance based on a disability, the employer is obliged to engage in an interactive process to attempt to fashion an appropriate reasonable accommodation.  <u>Id.</u> (citing <u>Tynan v. Vicinage 13 of Super. Ct. of N.J.</u>, 798 A.2d 648, 656 (N.J. Super. Ct. App. Div. 2002)).  Once the employee makes a facial showing of discrimination, the burden is placed on the employer to demonstrate that a reasonable accommodation cannot be provided to the disabled employee.  <u>Id.</u> (citation omitted).  If the proposed reasonable accommodation would impose an undue hardship on the employer, then the employer does not have to accommodate the employee.  <u>Id.</u> at *4.

In this case, Dennis has provided sufficient evidence to support a finding that he made a written request for a reasonable accommodation (a medical withdrawal) because of his disability (his perceived heart condition).  After consultation with his instructors for advice, on February 20, 2009, Dennis wrote to Director Nettles:

---

disability, rather than a perceived disability, and the reasonable accommodation analysis would need to determine whether his heart condition could be accommodated.

16

> "This recruit was notified by his doctor on 19 February
> 2009 that I need to be tested for Coronary Artery
> Disease.  The test is scheduled for Tuesday, 24
> February 2009.  The test is a Nuclear Stress Test.  Due
> to three missed Physical Training sessions this week,
> and possibly missing three next week, this recruit is
> requesting to be medically withdrawn from the academy."

(Def. Ex. E.)

Administrative regulations set out the specific requirements
of the reasonable accommodation process mandated by the NJLAD,
and relevant to the case here, one example of a reasonable
accommodation specified in the regulations is providing a
disabled employee with a leave of absence.  N.J.A.C.
13:13-2.5(b)(1)(ii).  Thus, Dennis's request for a medical
withdrawal--effectively a request for a leave of absence until
the next training academy session--is a request for a reasonable
accommodation under the NJLAD.

Dennis has also provided sufficient evidence to support a
finding that defendants rejected Dennis's proposed accommodation,
and failed to find any other ways to accommodate him.  On the
same day Dennis made his request for a medical withdrawal, his
request was summarily denied by defendant Murray:

> "I am in receipt of your written request to medically
> withdraw from the Corrections Officer Academy you are
> currently attending.  After consultation with the
> Police Training Commission and Division Director Thomas
> your request to medically withdraw is being denied.
>
> If you are found to be medically unfit to continue with
> the Academy after your next medical test or you are
> dismissed from the Academy for failure to complete all

required phases you are to report directly to this department."

(Def. Ex. F.)  The law requires an employer to determine whether it can reasonably accommodate an employee's disability, <u>Potente v. County of Hudson</u>, 900 A.2d 787, 791 (N.J. 2006) (citation omitted), but defendants made no effort to provide Dennis with any options should the medical tests have found him to be anything other than medically unfit.

Before he could continue with his physical training, the defendants required Dennis to see the County doctor, and the County doctor ordered a series of tests, the results of which would not be available until after Dennis had missed six training sessions.  Dennis's perceived disability and defendants' lack of accommodation placed him in a Catch-22: either Dennis had such a severe heart condition that the County doctor would not clear him for training, or he had only minor or no heart issues that would not render him unfit, but the testing to prove he was fit would cause him to exceed his allowable absences and be expelled from the academy.  Defendants' denial of Dennis's accommodation request, without working with him to find any alternatives, suggests a lack of good faith to cooperate in the interactive process.  <u>See</u> <u>Tynan</u>, 798 A.2d at 657 (explaining that to prove that an employer failed to cooperate in the interactive process, the employee must show, in part, that the employer did not make a good faith effort to assist the employee in seeking

18

accommodations, and that the employee could have been reasonably accommodated but for the employer's lack of good faith); Taylor v. Phoenixville School District, 184 F.3d 296, 312 (3d Cir. 1999) (describing examples of acting in bad faith "failure by one of the parties to help the other party determine what specific accommodations are necessary," "obstruct[ing] or delay[ing] the interactive process" of negotiating a reasonable accommodation, and "fail[ing] to communicate, by way of initiation or response").

Even though Dennis has provided evidence to support a finding that defendants failed to provide him with a reasonable accommodation for his perceived disability, it may still be found that defendants did not violate Dennis's NJLAD rights if defendants can show that no reasonable accommodation could be provided.  In order to prove that no reasonable accommodation existed to permit Dennis to continue as a corrections officer, defendants must first prove that the accommodation would impose an undue hardship.  In making that determination, which should be done on a case-by-case basis, factors to be considered include:

> I. The overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget;
>
> ii. The type of the employer's operations, including the composition and structure of the employer's workforce;
>
> iii. The nature and cost of the accommodation needed; and

iv. The extent to which accommodation would involve
waiver of an essential requirement of a job as opposed
to a tangential or non-business necessity requirement.

N.J.A.C. 13:13-2.5(b); Boyce, 2007 WL 1774267 at *4.

Also relevant to the "undue hardship" analysis is the ADA's
description of appropriate reasonable accommodations:  "job
restructuring, part-time or modified work schedules, reassignment
to a vacant position, acquisition or modification of equipment or
devices, appropriate adjustment or modifications of examinations,
training materials or policies, the provision of qualified
readers or interpreters, and other similar accommodations for
individuals with disabilities." 42 U.S.C. § 12111(9)(A),(B),
cited in Victor, 4 A.3d at 138 (looking to federal law because
the NJLAD's reasonable accommodation protections are not
explicit).

In this case, defendants do not necessarily argue that
Dennis's requested medical withdrawal would have resulted in an
undue hardship, but they contend that they had no ability to
provide that accommodation because New Jersey state statute
requires eighty percent attendance in the physical training
program, and without fulfilling that obligation, Dennis could not
remain a corrections officer.  Defendants' position, however, is
off the mark.

It is indisputable that in order to hold the position of a
corrections offer beyond the probationary period, Dennis was

required to successfully complete the police academy, which
includes participating in eighty percent of the physical training
sessions.  N.J.A.C. 10A:31.5.3(g); Directive No. 6-98; N.J.S.A.
52:17B-68.1.  It is also indisputable that defendants have no
discretion to modify that attendance requirement.  Thus, if
Dennis had asked to be accommodated by being allowed to only
attend seventy-five percent of the physical training sessions,
defendants could not afford him that accommodation.

    Defendants do have discretion, however, in one important
area that could have enabled them to engage in the process of
finding a reasonable accommodation for Dennis, either as he
requested, or in another way.  Dennis has provided evidence that
the decision to allow a probationary corrections officer to
obtain a medical withdrawal from the program and restart it again
in the future is discretionary.  In the administrative hearing,
Warden Thomas "said it was a discretionary function that allows
him to reject a withdrawal request and he was not aware of any
statute, law or ordinance that otherwise restricted that
function."  (Def. Ex. M at 6.)  The Director of Police Training
for Atlantic County, George Nettles, testified similarly: "Mr.
Nettles said it is discretionary for the Appointing Authority to
approve or disapprove requests for withdrawals."  (Id. at 3.)

    Believing as true that defendants had discretion in denying
Dennis's accommodation request, defendants have not explained how

approving Dennis's medical withdrawal request would have caused
them an undue hardship.  To the contrary, Dennis has provided
evidence to show that the County has allowed other police academy
trainees--at least 5 to 10--to withdraw from the academy for
medical reasons, prior to exceeding their allotted absences, and
restart the program at another time, or to make up the portion of
the training that they missed due to medical reasons.  (See Def.
Ex. M at 4; Pl. Ex. A 32-9, testimony of Bondiskey; Pl. Ex. G 44-
2, testimony of Bianchi; Pl. Ex. I, Certification of Michael
Mercado.)  It is defendants' obligation to show the flaws in
Dennis's requested accommodation, and they have failed to do so.[6]

---

[6]Coupled with defendants' immutable attendance policy
argument is their contention that Dennis only had two chances to
complete the academy, which extinguished when he could not attend
the first academy due to high triglyceride levels revealed during
the pre-academy physical, and then was dismissed from the second
academy due to his excessive absences.  Defendants argue that
they could not grant Dennis's accommodation request because to do
so would contravene the two-chance rule.
     The statute relevant to this issue provides, "A person shall
be given a probationary appointment as a corrections officer . .
. for a period of one year so that the person seeking permanent
appointment may satisfactorily complete a basic training course
for corrections officers . . . conducted at a school approved by
the Police Training Commission." N.J.S.A. 52:17B-68.1.  Because
the police academy is held twice a year, the two-chance rule has
a basis in the law.  Defendants do not explain, however, whether
the grant of a medical withdrawal to a probationary corrections
officer would toll the one-year window to complete the academy,
or whether they have discretion to extend the time beyond one
year.  It is defendants' obligation to show their good faith in
attempting to make an accommodation for Dennis, and Dennis's
evidence of other probationary officers' medical withdrawals is
sufficient to support a claim that they did not act in good
faith. Victor v. State, 4 A.3d 126, 149 (N.J. 2010) ("Engaging
in the interactive accommodation process 'does not dictate that

See Ensslin v. Township of North Bergen, 646 A.2d 452, 457 (N.J. Super. Ct. App. Div. 1994).

Based on the foregoing, Dennis has provided sufficient evidence, which if believed by a jury, could support a *prima facie* case of "perceived as" disability discrimination under the NJLAD.  The burden now shifts, in accordance with the McDonnell Douglas burden-shifting paradigm, to defendants to demonstrate a legitimate business reason for their decision.  See Victor v. State, 4 A.3d 126, 141, 141 n.9 (N.J. 2010) (explaining that after a plaintiff establishes a *prima facie* case, under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in which the U.S. Supreme Court created a three-part burden shifting mechanism applicable to discrimination claims, the burden shifts to the defendant to demonstrate a legitimate business reason for the employment decision, and if the employer does so, the burden shifts again and the plaintiff is required to demonstrate that the reason proffered is a mere pretext for discrimination).  In their motion for summary judgment, however, defendants have not argued beyond Dennis's inability to make his *prima facie* case, and have therefore not articulated a reason for Dennis's termination in the specific context of the McDonnell Douglas burden-shifting analysis.

---

any particular concession must be made by the employer . . . [but instead what it] requires is that employers make a good-faith effort to seek accommodations.'" (citation omitted)).

As stated above, the viability of Dennis's NJLAD claim depends on whether he can establish the second element of his *prima facie* case: that he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation.  Defendants' motion for summary judgment focuses on the reasonableness of Dennis's requested accommodation.  The Court has found that Dennis has provided sufficient evidence to support a claim that defendants failed to engage in the interactive process of trying to find a reasonable accommodation, and they have failed to meet their burden of showing how the requested accommodation would have caused them an undue burden.

Defendants do not argue any basis--other than his failure to complete the police training academy within one year--for Dennis's inability to perform the essential elements of his job as a corrections officer, which, if they did make such an argument, it would be in line with their burden in the McDonnell Douglas analysis to show a legitimate business reason for the employment decision.  There is evidence in the record that suggests that beyond Dennis's perceived heart condition, the police training instructors and defendants had other concerns related to Dennis's ability to complete the physical fitness portion of the academy, and ultimately be qualified to maintain the physically demanding position of a corrections officer.  Moreover, the NJLAD "leave[s] the employer with the right to fire

24

or not to hire employees who are unable to perform the job, whether because they are generally unqualified or because they have a handicap that in fact impedes job performance." Raspa v. Office of Sheriff of County of Gloucester, 924 A.2d 435, 442-43 (N.J. 2007) (citations omitted); see also N.J.S.A. 10:5-4.1 ("All of the provisions of the act . . . shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time disabled  . . . unless the nature and extent of the disability reasonably precludes the performance of the particular employment."). Because, however, defendants have not advanced any arguments on that basis, whether those concerns are sufficient to ultimately defeat Dennis's NJLAD claim must be left for another day. Consequently, defendants' motion for summary judgment on Dennis' NJLAD claim must be denied.[7]

---

[7]Defendants Bondiskey and Murray argue that Dennis's NJLAD claim must be dismissed against them because Dennis has not shown how they were involved in the alleged discrimination. Dennis has testified that Bondiskey advised him to ask for a medical withdrawal, and Murray denied Dennis's request for a medical withdrawal. Because of these individual defendants' involvement with Dennis's request for accommodation of his perceived disability, and because his NJLAD claim remains pending, the Court will not dismiss Dennis's claims against Bondiskey and Murray at this time. See Tarr v. Ciasulli, 853 A.2d 921, 928 (N.J. 2004) (explaining that an individual may only be held liable under the NJLAD if he is an "aider or abettor"); N.J.S.A. 10:5-12e (holding that it is unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the LAD]").

### B.   Dennis's FMLA claim

Dennis also claims that defendants interfered with his FMLA rights when he requested FMLA leave due to the injuries he sustained when he slipped on ice and fell down his front steps. Defendants argue that Dennis's FMLA claim fails because there is no connection between Dennis's request for FMLA leave and his termination.

As detailed above, on the same day he missed his sixth physical training session, March 4, 2009, Dennis slipped on ice and fell down the front steps at his home, injuring his shoulder, knee and back.  He went to the emergency room that day.  On March 5, 2009, the following occurred:

(1)  Dennis saw the primary care physician.

(2)  Dennis saw the orthopedic specialist.

(3)  The orthopedic specialist completed paperwork so that Dennis could request leave under the FMLA from March 4, 2009 - March 23, 2009.

(4)  Dennis turned in his FMLA request to the ACJF.

(5)  The officer who received Dennis's FMLA paperwork provided Dennis with a memorandum confirming his request for leave from March 4, 2009 through March 22, 2009.  That memorandum instructed Dennis that he would be notified "whether or not [his] absence is being confirmed as FMLA leave."  (Pl. Ex. R.)

26

(6) Dennis was dismissed from the police training academy for missing six (twenty percent) of the physical fitness training sessions.

(7) Dennis signed an acknowledgment that he was dismissed from the police training academy because of his sixth absence.

(8) Dennis was still employed by ACJF.

Four days later, on March 9, 2009, defendant Bondiskey received Dennis's FMLA paperwork that had been forwarded to him for his review.  In a memorandum to Warden Thomas, Bondiskey stated that he found the dates on the paperwork to be conflicting.  (Def. Ex. K.)  Instead of contacting Dennis for more information regarding his FMLA request, Bondiskey "did not forward" Dennis's FMLA request for further processing because of his March 5, 2009 dismissal from the academy and his suspension from his position at ACJF that would be effective on March 10, 2009, per the "notice of disciplinary action" completed by Warden Thomas on March 9, 2009.

Dennis claims that defendants interfered with his right to FMLA leave.[8]  The FMLA grants an "eligible employee" the right to

---

[8]Dennis also generally alleges that defendants retaliated against him with regard to his FMLA rights.  Such a claim is not actionable here.  To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that: (1) he took FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave. Lepore v. Lanvision Systems, Inc., 113 Fed. Appx. 449, 452, 2004 WL 2360994, *2 (3d Cir. 2004) (citing Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135 (3d Cir. 2004)).  Even

12 work-weeks of leave over any 12-month period because of, among other things, "a serious health condition that makes the employee unable to perform the functions" of the employee's position.  29 U.S.C. § 2612(a)(1).  After a period of qualified leave, an employee is entitled to reinstatement to his former position or an equivalent one with "equivalent employment benefits, pay and other terms and conditions of employment."  Id. § 2614(a)(1).  Moreover, the taking of FMLA leave, "shall not result in the loss of any employment benefit accrued prior to the date on which leave commenced."  Id. § 2614(a)(2).  This right is limited, however, by the proviso that the restored employee shall not be entitled to "the accrual of any seniority or employment benefits during any period of leave[,] or . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  Id. § 2614(a)(3)(A),(B).

The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

---

if it were determined that Dennis was on FMLA leave at the time he was suspended from employment with ACJF, Dennis has not provided any evidence that Warden Thomas knew of Dennis's FMLA leave request when he issued his Preliminary Notice of Disciplinary Action, which suspended Dennis's employment with ACJF pending a final hearing with the hearing officer.  Moreover, Dennis has not provided any evidence to show that his suspension was related to his FMLA leave, and not for his failure to complete the police training academy.  Accordingly, any claim for FMLA-based retaliation fails.

exercise, any right provided" in the FMLA.  Id. § 2615(a)(1).
Such a claim is typically referred to as an "interference" claim,
and it sets the floor for employer conduct.  Sommer v. The
Vanguard Group, 461 F.3d 397, 398-99 (3d Cir. 2006).  To deter
such interference, Congress has provided that an employer may be
found liable for civil damages that include: compensatory damages
for any wages, salary, employment benefits or other compensation
lost by reason of the violation; and liquidated damages.  Id. §
2617(a)(1)(A).

     To assert an interference claim, "the employee only needs to
show that he was entitled to benefits under the FMLA and that he
was denied them."  Sommer, 461 F.3d at 399 (citation omitted).
"Under this theory, the employee need not show that he was
treated differently than others[, and] the employer cannot
justify its actions by establishing a legitimate business purpose
for its decision."  Id. (citation omitted).  "An interference
action is not about discrimination, it is only about whether the
employer provided the employee with the entitlements guaranteed
by the FMLA."  Id. (citation omitted).

     It is defendants' position that Dennis's right to FMLA leave
was not tampered with because he was effectively terminated prior
to requesting his leave, and he was thus not entitled to leave.
Defendants also contend that even if Dennis were on FMLA at the

time of his suspension, he would have been terminated anyway for his failure to complete the academy.[9]

Defendants' first argument is unavailing.  Although Dennis had been dismissed from the academy on March 5, 2009, he was still employed by ACJF on that day, which is the day he submitted his formal written request for FMLA leave.  Even though his ultimate termination from ACJF may have been contemplated at that time, his suspension notice from ACJF was not drafted until March 9, 2009, and not effective until March 10, 2009.  Therefore, defendants have not provided any evidence that Dennis was not an FMLA-entitled employee on March 5, 2009.

Defendants' second argument also fails.  Despite ACJF's apparent intention to terminate Dennis due to his failure to complete the police academy regardless of any FMLA request, this other "legitimate business purpose" cannot absolve its conduct if it nonetheless interfered with Dennis's rights under the FMLA.

To prove his FMLA interference claim, Dennis has provided evidence that he completed an FMLA request supported by medical documentation, it was accepted by ACJF, and it was forwarded to Bondiskey, who, although questioning the dates on Dennis's

---

[9]Defendants also argue that there is no causal connection between Dennis's request for FMLA leave and his suspension.  As noted above, supra note 8, the Court agrees that Dennis has not provided any evidence to show a causal connection between his FMLA request and his termination that would support a FMLA retaliation claim.  Such a finding, however, is not dispositive of Dennis's interference claim.

documents, failed to continue ACJF's internal processing of the paperwork due to Dennis's pending termination.  This evidence, if believed, may support a finding that ACJF interfered with Dennis's FMLA rights by "refusing to authorize FMLA leave," "discouraging an employee from using such leave," and "manipulation by a covered employer to avoid responsibilities under FMLA."  29 C.F.R. § 825.220.  Defendants have not provided any other evidence to challenge the viability of Dennis's FMLA interference claim.  Consequently, defendants' motion for summary judgment on Dennis's FMLA claim must be denied.[10]

### C.  Dennis's Loudermill & Weingarten claims

Dennis claims that on the day Bondiskey and Murray came to his home and served him with the notice of disciplinary action, which suspended him pending a termination hearing before a hearing officer, his procedural due process rights as a union-represented public employee were violated under Cleveland Bd. of

---

[10]If a jury were to find that ACJF interfered with Dennis's FMLA rights, Dennis is only entitled to those rights of employment to which he would have been entitled had he not taken the leave.  Sommer, 461 F.3d at 401 (citing 29 U.S.C. § 2614(a)(3)).  This means, Dennis would only be entitled to "compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered" until March 22, 2009.  See 29 C.F.R. § 825.220.

Educ. v. Loudermill, 470 U.S. 532 (1985) and NLRB v. Weingarten, 420 U.S. 251 (1974).

In Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985), the Supreme Court explained that the state is required to provide certain procedural safeguards when there is a risk of deprivation of a person's life, liberty or property interests. Under Loudermill, the state must provide public employees with pre-termination notice of the charges against them and an opportunity to respond.  Loudermill, 470 U.S. at 545. Specifically, a public employee is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story."  Id. at 546 (citation omitted).  The Supreme Court's decision in NLRB v. Weingarten, 420 U.S. 251 (1974), entitles employees who are union members to union representation during investigatory interviews.

Dennis's claims under Loudermill and Weingarten both fail. First, even though Dennis did not receive his full Loudermill rights on his front door step on March 10, 2009, he subsequently received a formal hearing before a hearing officer, during which the charges against him were explained, ACJF's evidence was presented, and Dennis's counsel challenged the charges and evidence, and presented Dennis's side of the story.  Second, even though Dennis did not have union representation when Bondiskey

32

and Murray came to his home, any claim under Weingarten is
preempted.  See Delbridge v. Acme Food Corp., 2010 WL 148803, *3
(D.N.J. 2010) (citing Voilas v. Gen Motors Corp., 170 F.3d 367,
378 (3d Cir. 1999) (explaining that it is well settled that the
National Labor Relations Board ("NLRB") has exclusive
jurisdiction over all actions pertaining to alleged unfair labor
practices, and, thus, any claim under Weingarten is preempted);
see also Schult v. International Business Machines Corp., 123
Fed. Appx. 540, 542 (4th Cir. 2004) (same).  Consequently,
defendants are entitled to summary judgment on Dennis's
Loudermill and Weingarten claims.

## CONCLUSION

For the reasons expressed above, defendants' motion for
summary judgment is denied as to Dennis's NJLAD and FMLA claims,
and it is granted as to Dennis's claims for violations of the
ADA, Loudermill and Weingarten.  An appropriate Order will be
entered.


Date: March 28, 2012             s/ Noel L. Hillman
                                 NOEL L. HILLMAN, U.S.D.J.


At Camden, New Jersey

33